(No. 84-CC-0961– )

ROBERT M. NEBGEN, JAMES F. NEBGEN, L. E. YEAGER, and CARL H. TEMPEL, Claimants, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 12, 1994.*

*Order on petition for rehearing filed August 8, 1994.*

PESSIN, BAIRD & WELLS (SAM S. PESSIN, of Counsel) for Claimants.

ROLAND W. BURRIS, Attorney General (JAMES C. MAJORS, Assistant Attorney General, of counsel), for Respondent.

## OPINION

JANN, J.

Claimants seek judgment against Respondent for damages claimed to have been sustained by Claimants through the fraud of a representative of Respondent's Department of Commerce and Community Affairs.

Claimants contend that they sought funding for a new industry to be located in East St. Louis. Claimants allege that they had arranged financing to commence the project through the officials and representatives of East St. Louis. Claimants assert that John Smith, an agent, employee or servant of Respondent's Department of Commerce and Community Affairs fraudulently represented to Claimants that he had obtained "private" funding for their project through a Florida trust, and through his contacts Claimants could avoid bonding costs. Claimants contend that in reliance on Respondent's agent, Claimants cancelled arrangements for an industrial revenue bond issue that had been approved by representatives of the City of East St. Louis. Further, in reliance on Respondent's agent, Claimants borrowed $50,000 to meet initial expenses. After having borrowed the $50,000 and having paid initial expenses, Claimants claim never to have heard from Respondent's agent again. Claimants advised representatives of Respondent's department of the failure of Respondent's agent to follow through on the financing arrangements. Apparently after having played a taped telephone conversation for the director of the department, Respondent's agent was interviewed by department officials and resigned on the spot.

Claimants seek damages against Respondent in the amount of $71,375.05, being the amount of principal and interest on a $50,375 loan obtained by Claimants for payment of initial expenses in reliance on the alleged fraudulent representations of Respondent's agent.

Respondent contends that their agent was far outside the scope of his employment and authority if, indeed, the representations made by Respondent's representative were as alleged by the Claimants.

Claimants contend that after contacting Respondent's Department of Commerce and Community Affairs, they were referred to John Smith. The City of East St. Louis was committed to giving Claimants a 26.5 acre tract of land for $1 for an industrial site at a location which had 2.6 million dollars of funds dedicated to it for development of streets, sewers and lighting. East St. Louis had also offered Claimants a 10-year tax abatement for up to a million dollars, and the city was willing to issue industrial revenue bonds in the amount of approximately six million dollars to help fund the project. The project could have been funded with the industrial bond issue. Appropriate resolutions were passed by the East St. Louis City Council.

Claimants contend that Respondent's representative John Smith caused Claimants to back out of the arrangements with East St. Louis and "shut that all down." Claimants had been referred to John Smith by a representative of Respondent's Department of Commerce and Community Affairs. Smith was introduced as a colleague in the Respondent's Department of Commerce and Community Affairs, and that Smith "may be able to assist" the Claimants. Claimant Robert M. Nebgen testified that Smith advised Nebgen that Smith had knowledge of people who could provide financial assistance to Claimants. Smith stated to Nebgen in the presence of Don Falls of Respondent's department (Department of Commerce and Community Affairs) that it was Smith's job to assist people like the Claimants in developing industries within the State of Illinois, and that he met "all kinds of people that had funding available." According to Claimant Nebgen, Smith advised Nebgen that by using his sources of funding, Claimants could avoid the cost of bonding and the costs of people who do all the bonding work. Smith

represented to Claimants that Smith was contacting the "Ulena Trust," and that those people could possibly fund Claimants' project, thereby avoiding a revenue bond issue. The initial meeting between Claimant Robert M. Nebgen and John Smith was in July of 1982 at the office of Don Falls of Respondent's department in Springfield. Nebgen testified this was the only time that Claimants met face to face with John Smith, and that further communications were by phone conversation. Claimants contend that they sought from Smith, and were granted, authority to tape telephone conversations between Smith and Robert M. Nebgen so that other investors in the project could hear the conversations if they were unavailable to hear them first hand. Thereafter, some of the conversations between Robert M. Nebgen and John Smith were taped but later erased and not preserved. One conversation was preserved which occurred in July 1982 toward the end of the month. The transcript of the conversation was marked as Claimant's Exhibit #3. In the conversation marked and identified as Claimant's Exhibit #3, Smith represented to Claimants that he had tentative approval from the Ulena trust for the funding of the project. Claimants contend that a week later Smith called back and said that he had obtained "final approval" and that everything "was okay." Claimants contend that Smith advised Claimants that the funding through the industrial bond issue of the City of East St. Louis would no longer be required.

In reliance on Smith's representations, Claimants contacted the people with whom they had been dealing in East St. Louis and advised them that their funding was no longer necessary. Further, in reliance on Smith's representation, Claimants borrowed $50,000 to pay expenses. A local bank loaned Claimants $50,000 and required individual guarantees by the Claimants to secure the debt. The

loan was at 15.5% interest (prime + 2). Claimants used the $50,000 to pay expenses incurred by Claimants in developing the project to that point, and paid off the CPA firm to whom they had been referred by Respondent's department at the outset.

Claimants never heard from John Smith again after the July phone call. When Claimants were unable to reach John Smith or Don Falls, a representative of Respondent's department with whom they had conferred, and the person who had introduced them to Smith, Claimants became suspicious and made contact with an FBI agent with whom Claimants were acquainted to check on the "Ulena Trust," purportedly located in Miami, Florida. Claimants were unable to learn anything about the "Ulena Trust." Claimants contacted the assistant to the director of Respondent's department who claimed to be ignorant of the situation. Claimants were invited to come to Springfield with the taped telephone conversation. Claimants drove to Springfield and met with Respondent's assistant director Woelfer. The taped telephone conversation was played and Respondent's agents made a tape recording of the taped conversation. Woelfer advised Claimant Robert Nebgen that the department had suspected that John Smith "had been doing this kind of thing for quite awhile" and that Claimant's tape recording was "the first piece of hard evidence" that Smith was "engaged" in this kind of activity. Woelfer advised Robert Nebgen that the director of the department called John Smith in and played the tape for him and Smith resigned on the spot.

In a later conversation between Claimant Robert Nebgen and Peter Fox, the director of the Department of Commerce and Community Affairs that occurred in May or June of 1983 at Claimant's home in Belleville, Fox asked Claimant what Claimant "thought the State of Illinois was

responsible for." Nebgen testified that the director of the department told Claimants that he (the director) agreed with Claimants as to what had happened, and that their project had been destroyed by John Smith's activities, and that he (the director) felt the same way as Claimants and that he (the director) was going back to Springfield and arrange "to set things straight." Fox told Claimants that "they" had a fund available "like a contingency fund" for things like this, and that he (Fox) would go back to Springfield and "take care of it." Claimants did not receive any funds.

Neither Claimants nor Respondent offered the testimony of John Smith and there is no evidence in the record from which it can be determined that the "Trust" to which John Smith apparently made reference in his telephone conversations with Claimants ever did or did not exist. Neither Claimants nor the Respondent presented Mr. Fox as a witness or representatives from the City of East St. Louis.

Claimants seek to impose liability on the State of Illinois because they claim they relied on telephone conversation representations of a State employee that certain private funding sources had agreed to loan money to the Claimants. Predicated on these representations, Claimants abandoned a plan to finance their venture through industrial revenue bonds authorized by the city officials of East St. Louis, Illinois. In further reliance on the representations of John Smith, Claimants contend that they borrowed money to pay expenses Claimants had incurred on the proposed project including bills of accountants for "feasibility studies" obtained by Claimants without regard to the alleged faults or misleading representations of John Smith. Implicit in the theory of detrimental reliance and fraud advanced by Claimants for recovery in this case, is the

proposition that Claimants placed total trust and confidence in the representations of John Smith pertaining to his success in arranging private financing for Claimants, which was supposed to be on better terms than Claimants could obtain under the plan to which the City of East St. Louis, Illinois, was apparently committed. Claimants do not contend that any representative of Claimants ever had direct contact with the "Ulena Trust," or any agent, servant or representative thereof. The record is sparse as to what information concerning Claimants' project had been furnished to the "Trust" by John Smith. Since John Smith did not testify and no information was apparently obtainable from the "Trust," the record is barren as to whether the purported "Trust" was a figment of Smith's imagination, or, instead, if the trust actually existed and had actually made commitments to Smith which Smith passed on to the Claimants. This Court is left to speculate as to much of the hard information which predicates the "facts" and circumstances of Claimants' claim against Respondent.

Claimants' essential contentions in support of their claim against Respondent are as follows:

(a) Claimants' "project" would have been funded and the expenses of Claimants duly paid from the industrial revenue bond issue authorized by the City of East St. Louis but for the verbal representations made by Respondent's agent that he had secured "private" funding for Claimants' project through the "Trust."

(b) Claimants' action in withdrawing from the proposed financing arrangement to which the City of East St. Louis had committed itself was reasonable, and was predicated entirely on the representations of Respondent's agent to Claimant that Respondent's agent had secured "private" funding on more favorable terms for the Claimants' project.

(c) That the private funding obtained by Respondent's agent for Claimant's project would have paid Claimant's project expenses, and that but for John Smith's representations to Claimants, they would not have borrowed $50,000 to cover those project expenses, and would not have become liable for the repayment thereof.

(d) Claimants' reliance on Smith's representations without first making any direct contact between Smith's alleged funding source and Claimants or their representatives, was reasonable.

(e) When a hopeful entrepreneur is told by Respondent's agent that private funding for the entrepreneur's project can be obtained through contacts made by representatives of State economic development agencies, any undertakings or financial commitments made by such entrepreneur on the strength of verbal representations by such agents of Respondent, may be "insured" by Respondent on the basis of claims by such entrepreneur that if these commitments are not kept by private entities, then the State may be liable to reimburse such entrepreneurs for their losses sustained.

Respondent contends that the agent of the State, John Smith, worked a fraud upon the Claimants. In essence, Smith misinformed Claimants or failed to "follow through" on obtaining financing for Claimants from some private source known only to Smith, and which Smith had represented had been both tentatively and finally approved by the unknown private funding source. Claimant argues had it not been for Smith, Claimants would have completed the industrial revenue bond funding. Claimant asserts Respondent's liability under the theory of *respondeat superior*, and that, in any event, when the department director, Peter Fox, indicated to Claimants that he would seek reimbursement to Claimants

from department contingency funds that this verbal undertaking by Fox at a meeting with Claimants was binding upon Respondent.

Claimant argues that Respondent may not successfully defend on the basis that their employee, John Smith, acted contrary to Respondent's policies and procedures, and that "under common law principles of *respondeat superior*, a principal is liable for the deceit of its agent, if committed in the very business the agent was appointed to carry out." Respondent makes no such argument. Instead, Respondent argues that when a representative of State government asserts that he has found private financing for a hopeful entrepreneur, these representations do not bind the Respondent and are not intended by either the State or its representative to bind the Respondent, State of Illinois. It is not suggested in the transcript or depositions that John Smith ever purported to bind the State of Illinois to any agreement with Claimants or their representatives. A suggestion by the director of the Department of Commerce and Community Affairs that he would look into the question of reimbursing Claimants from the department's contingency funds does not represent any admission or commitment on the part of Respondent to reimburse Claimants for the funds spent by Claimants as project expenses prior to the time that it was determined that Smith's assertions regarding his contact with private funding sources, and the availability of private funding sources had either proved false, or had not been pursued and brought to fruition by Smith on behalf of the Claimants.

The record as a whole in this case, demonstrates that Smith apparently either lied to the Claimants about having secured private funding, or simply failed to follow through on funding arrangements with private sources

actually committed to the Claimants' project. It may be that if Smith had followed through with the contacts he said that he had made with private funding sources, Claimants' project may, indeed, have been benefited by those sources. Although it is not clear from the record, it appears that Smith's employment by the State was terminated when the department director heard the tape of the conversation between Smith and Robert Nebgen transcribed and admitted into evidence as Claimant's Exhibit #3. From a review of the transcript of the telephone conversation, it is just as believable that Smith's sudden resignation upon being confronted with the tape of the conversation, was predicated upon Smith's own statements of intent to become personally involved in the investment as it would be to assume that Smith's sudden resignation was predicated upon the fear that he had been found to be making fraudulent statements to the Claimants about his efforts in obtaining private funding for their project. Implicit in the Claimant's argument is that when Smith was confronted with the taped conversation, his resignation was predicated upon some belief that he had made misleading or fraudulent statements to Claimants concerning his activities on behalf of arranging private financing. Since there is no evidence in the record from Smith or from any persons purporting to represent the mysterious "trust" entity with whom Smith was allegedly dealing, it is impossible for this Court to make any determination as to the cause or reasons for Smith's actions; or, indeed, whether the representations made by Smith to the Claimants were, in fact, misleading or fraudulent.

Respondent's argument is persuasive that there is no evidence from which it can be concluded that Smith purported to bind Respondent to any financial obligation to the Claimants. Claimants' own evidence through Claimants' witness Nebgen demonstrates that Nebgen was not

relying on any agreement with Respondent, but instead, was relying on the fact that Smith was an agent of Respondent, and was making representations concerning his activity on Claimants' behalf not in striking agreements with a private funding source located in Miami, Florida which would benefit Claimants.

The best that can be said for the actions of Claimants in this case in placing such total and irrevocable reliance on the verbal representations of John Smith, would be that their actions in reliance on Smith's statements were precipitous and unwise. At worst, Claimants' contention that they may seek indemnity from the State of Illinois for undertakings that they voluntarily entered into on the sole basis of telephone conversations with John Smith concerning the availability of private funding and without any contact with the funding entity or any agent, servant or employee thereof, was ill-advised, premature and self-destructive. It is unreasonable in the extreme for this Court to be asked to assess Respondent with the responsibility of indemnification to plaintiffs for their preliminary project expenses because of the verbal representation made by a State employee as to what arrangements he had been able to make with private funding sources for hopeful entrepreneurs. The actions of Claimants in apparent reliance on Smith's representations were naive and premature, and losses resulting therefrom should not be the responsibility of the State. Indeed, the bulk of the expenses covered by Claimants' loan were expenses which would have been repaid by Claimants or by their new commercial entity in any event whether they had obtained private funding for their proposed enterprise, or whether they had continued to pursue the previously approved funding package offered by the City of East St. Louis.

The record is barren of any evidence that the representations of Smith to the Claimants were false. From the record, it is impossible to determine what steps, if any, were taken by representatives of the Respondent toward following through with the proposed private financing plan which may have been discovered by Smith. Smith resigned from the agency, and since Claimant's attempts through a contact with the FBI had failed to turn up the identity or location of the private funding source with whom Smith was allegedly dealing, efforts to complete that arrangement were apparently abandoned, not only by Respondent and its department, but also by the Claimants.

Claimants' tort claim against Respondent is predicated upon a fraud. This Court is asked to assume that the entity known as "Ulena Trust" was fictional. Claimant contends "all the investigation into the Ulena Trust, even by having an FBI man in Miami try to check it out, showed it was clearly false and known by Smith to be false, as evidenced by his superior." The only reference to attempts on the part of Claimants or Respondent's agents at locating the "Ulena Trust" are reflected in the transcript. Nebgen stated that he called a friend of his who was with the FBI in Miami "and asked him if he would please check and see if this Ulena Trust was registered in Florida or registered in the United States or if, in fact, it existed because we didn't know where we were going at that point." There is no evidence as to what the inquiry to the FBI agent produced by way of information but, when asked if Nebgen was able to learn anything at all as to the existence or location of the "Ulena Trust," his sole reply was "No." Respondent's agent, Biderbecke testified that the department made no investigation as to the existence of the Miami, Florida trust.

Parties are not justified in relying on representations made, when they have ample opportunity to ascertain the truth of such representations before they act. A claimant relying on fraud must be prepared to demonstrate that he acted reasonably under the circumstances respecting the degree of diligence and prudence that a normal person would employ in protecting their own interests. In the case at bar, despite the passage of two months between the end of July 1982 and the month when Claimants first became alarmed and made inquiry of Respondent's department, Claimants made no contact with Smith in an effort to be put in direct communication with those representing the "Ulena Trust," and apparently relied entirely on Smith to make *all* of the arrangements for the private funding program which involved many millions of dollars. These are not the actions of reasonably prudent businessmen seeking to finance a multi-million-dollar venture. There is no evidence in the record from which it can be concluded that John Smith ever made any misstatement directly or by omission to the Claimants, or any of them. An essential element of actual fraud is the intent to deceive. Even constructive fraud, although not requiring actual dishonesty or intent to deceive, involves a breach of legal or equitable duty which irrespective of moral guilt, is legally fraudulent because of its tendency to deceive. In any event, on the record in this case, there is no proof of deception in either a constructive or actual sense. The Court is asked to "imply" that Smith had deceived the Claimants and that damages done by the Claimants to themselves in apparent reliance on Smith's statements, however imprudent, may be asserted as a ground of liability against Respondent.

## Conclusion

There is no evidence in the record in support of essential elements of proof required to support Claimants'

action predicated upon the theory of fraud. Even if the record could be said to support the conclusion that Smith's statements made to the Claimants were false, it is doubtful that Claimants could maintain Claimants' burden of showing their reliance over a two-month period on these assertions with no attempt on their part to make direct contact with the supposed private funding source was reasonable or in accord with any reasonably-prudent standards of inquiry that might be expected of hopeful entrepreneurs finding themselves in the position of the Claimants in this case. Claimants speculate that Smith's employment termination with the Respondent's department was predicated solely on the representations made by Smith to the Claimants as revealed in the taped telephone conversation. This speculation cannot support the Claimants' case. It is just as reasonable to speculate that Smith's rapid departure from the department was brought about by the disclosure that he was endeavoring to provide himself with some financial gain or investment opportunity, in a situation in which he clearly had a conflict of interest, than to suppose otherwise.

Claimants do not assert that Respondent's agency was negligent in failing to. follow Smith's attempt to arrange private financing for the Claimants; further, Claimants suggest that their own failures, beyond the meager inquiry that they apparently made of a friend who was in the FBI, should not adversely affect their claim. It is not possible on the basis of the record in this case, for this Court to conclude that Smith's statements to the Claimants were in the least bit deceptive, misleading or false. The most that can be said, is that Smith left the Respondent's department, and that nobody in the department or among the Claimants made any reasonable effort to follow through and to determine if Smith's representations were, indeed,

false or whether, instead, there was a private trust who had, through Smith's efforts, committed to privately funding the Claimants' venture.

This claim is hereby denied.

## ORDER

JANN, J.

This cause coming on to be heard on Claimants' petition for rehearing, the Court having reviewed the evidence and arguments herein finds:

Claimants' petition is hereby denied. Claimants' petition seeks a decision based upon speculation and conclusions drawn from facts not in evidence.